Michael R. Crosner (SBN 41299)
mike@crosnerlegal.com
Zachary M. Crosner (SBN 272295)
zach@crosnerlegal.com
J. Kirk Donnelly (SBN 179401)
kirk@crosnerlegal.com
**CROSNER LEGAL, PC**
433 N. Camden Dr., Ste. 400
Beverly Hills, CA 90210
Tel: (310) 496-5818
Fax: (310) 510-6429

Attorneys for Plaintiff Laura Buford

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA BUFORD, on behalf of herself and others similarly situated,<br><br>            Plaintiff,<br><br> vs.<br><br>MEDICAL SOLUTIONS, L.L.C., a Nebraska limited liability corporation; and DOES 1 through 100, inclusive.<br><br>            Defendants. | Case No.:  4:18-CV-04864-YGR<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS AND REPRESENTATIVE ACTION SETTLEMENT**<br><br>**[Filed concurrently with Declarations of Zachary M. Crosner and Laura Buford; [Proposed] Order]**<br><br>Date:  January 14, 2020<br>Time: 2:00 p.m.<br>Place: Courtroom 1, 4th Floor<br><br>Hon. Yvonne Gonzalez Rogers |

1

**NOTICE OF MOTION**

2     PLEASE TAKE NOTICE that on January 14, 2020 in Courtroom 1, 4th Floor, of the

3 above-captioned Court, located at 1301 Clay St., Oakland, California, the Hon. Yvonne

4 Gonzalez-Rogers presiding, plaintiff Laura Buford will move the Court for preliminary

5 approval of a two part settlement consisting of a proposed class action settlement component

6 to be approved under Fed.R.Civ.P. 23(e), and approval of a second component consting of

7 a proposed settlement under the California Private Attorneys General Act, Cal. Labor Code

8 sections 2698, et seq., under Cal. Labor Code section 2699 (*l*)(2).  The terms of the

9 settlement are contained within the Joint Stipulation of Settlement and Release, filed

10 concurrently herewith as Exhibit A to the Declaration of Zachary M. Crosner. In addition,

11 Plaintiff requests that the Court certify the class described in Section II.40 of the Joint

12 Stipulation; approve the form of class notices and PAGA notice attached as Exhibits A-C to

13 the Joint Stipulation; and set a final approval hearing for June 9, 2020, or the first available

14 date on the Court's calendar thereafter.

15     This motion will be based on this Notice, the attached Memorandum of Points and

16 Authorities, the Joint Stipulation, the Declarations of Zachary M. Crosner and Laura Buford,

17 the Court's entire file herein, and on such further evidence and argument as may be presented

18 at the hearing.

19 Dated: December 10, 2019          CROSNER LEGAL, P.C.

20

21

22 ZACHARY M. CROSNER
   Attorneys for Plaintiff LAURA BUFORD

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 1

II.     STATEMENT OF FACTS..................................................................................... 2

III.    THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT ................... 5

    A.      Proposed Settlement Terms. .................................................................... 5

        1.      Calculation of Settlement Awards ................................................. 6

        2.      Nature And Method Of Notice ...................................................... 6

        3.      Objection & Opt-Out Procedures................................................... 7

        4.      The Claims Administrator.............................................................. 7

        5.      Attorneys' Fees And Litigation Expenses ..................................... 8

        6.      Incentive Award For Class Representatives .................................. 8

        7.      Releases......................................................................................... 8

    B.      The Settlement Meets the Requirements for Preliminary Approval as to the Class Claims, and the Requirements for Approval as to the SAG Claims........................................ 9

        1.      The Strength of Plaintiff's Case.................................................... 12

        2.      The Risk, Expense, Complexity and Likely Duration of Further Litigation ............... 18

        3.      The Risk of Maintaining Class Action Status Throughout the Trial. ...................... 18

        4.      The Amount Offered in Settlement............................................... 20

        5.      The Extent of Discovery Completed and the Stage of the Proceedings ...................... 23

        6.      The Experience and Views of Counsel.......................................... 23

        7.      The Reaction of the Class to the Settlement. ................................ 23

        8.      No Collusion Between the Parties or their Counsel........................ 24

IV.    THE COURT SHOULD CONDITIONALLY CERTIFY THE SETTLEMENT CLASS..... 24

V.     CAFA AND PAGA NOTICE ............................................................................. 25

VI.    CONCLUSION ................................................................................................. 25

1

# TABLE OF AUTHORITIES

## CASES

Acosta v. Trans Union, LLC, 243 F.R.D. 377, 386 (C.D. Cal. 2007)............................................ 11

Amaral v. Cintas Corp. No. 2,163 Cal.App.4th 1157, 1203-4 (2008) ........................................ 16

Arias v. Superior Court, 46 Cal.4th 969, 985-86 (2009)............................................................... 9

Brinker Restaurant Corp. v. Superior Court, 53 Cal.4th 1004, 1053 (2012) ............................... 13

Carrington v. Starbucks Corp., 30 Cal.App.5th 504 (2018).......................................................... 16

Clark v. AMN Services, Inc., 2018 WL 3357467 (C.D. Cal. June 26, 2018).................................. 3

Class Plaintiffs v. Seattle, 955 F.2d. 1268, 1290 (9th Cir. 1992).................................................. 11

Cotter v. Lyft, Inc., 193 F.Supp.3d 1030 (N.D. Cal. 2016) .......................................................... 16

Delgado v. Market Source, Inc., 2019 WL 4059850, at *3-4 (N.D. Cal. 2019) ....................... 2, 10

Fleming v. Covidien, 2011 U.S. Dist. LEXIS 154590, *8-9 (C.D. Cal. 2011)............................. 16

Franklin v. Kaypro Corp., 884 F.2d 1222, 1225 (9th Cir. 1989) .................................................... 9

Gautreaux v. Pierce, 690 F.2d 616, 621 n.3 (7th Cir. 1982) .................................................... 1, 10

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998) .................................................. 11

In re Murphy v. Kenneth Cole Productions, Inc., 40 Cal.4th 1094 (2007) ................................... 16

In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000) ......................................... 20

In re: Taco Bell Wage and Hour Actions, 2016 U.S. Dist. LEXIS 48557 (E.D. Cal. Apr. 8, 2016).
.................................................................................................................................................... 16

In re: Traffic Executive Ass'n-Eastern Railroads, 627 F.2d 631, 634 (2d Cir. 1980) ................... 11

Kirby v. Immoos Fire Protection, Inc., 54 Cal.4th 1244 (2012) ................................................... 16

Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998) ......................... 10, 20

Litty v. Merrill Lynch & Co., 2015 WL 4698475, *8 (C.D. Cal. Apr. 27, 2015)......................... 11

Makabi v Gedalia, 2016 Cal.App. Unpub. LEXIS 1489 (Mar. 2, 2016) ...................................... 16

Maldonado v. Epsilon Plastics, Inc., 22 Cal.App.5th 1308 (2018)............................................... 15

Officers for Justice v. Civil Service Comm'n, 688 F.2d 615, 625 (9th Cir. 1982)........................ 10

Salazar v. Sysco Central California, Inc., 2017 WL 1135801, at *3-4 (E.D. Cal. 2017) ........... 2, 10

Satchell v. Fed Ex. Corp., 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) .......................... 24

Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) ........................................................... 24

Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005)................................ 11

Wershba v. Apple Computers, Inc. 91 Cal.App.4th 224, 246, 250 (2001) .................................... 20

White v. Experian Information Solutions, Inc., 803 F.Supp.2d 1086, 1098 (C.D. Cal. 2011) . 20, 22

White v. Starbucks Corp., 497 F.Supp.2d 1080, 1083 (N.D. Cal. 2007)....................................... 12

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## STATUTES

28 U.S.C. section 1715 ................................................................................................ 25

Business & Professions Code §§ 17200 ...................................................................... 9

Cal. Labor Code sections 2698, et seq. ....................................................................... 1

Fed.R.Civ.P. 23(a) and (b)(3) .................................................................................... 24

Fed.R.Civ.P. 23(e) ................................................................................................. 9, 10

Fed.R.Civ.P. 23(e)(2) ................................................................................................ 10

Lab. Code § 2699(h) .................................................................................................. 16

Lab. Code § 512 ........................................................................................................ 13

Labor Code § 203 ................................................................................................. 9, 16

Labor Code § 2699(*l*)(2) ........................................................................................... 10

Labor Code §§ 203 and 226 ...................................................................................... 15

Labor Code section 2699(*l*)(2) .................................................................................... 1

Section II.40 ............................................................................................................... 2

Sections II.34 and 38 ................................................................................................... 1

Sections II.40-41 ......................................................................................................... 1

## OTHER AUTHORITIES

IWC Wage Order 5-2001, § 11(A) ............................................................................. 14

Conte & Newberg, Newberg on Class Actions (4th ed. 2002), § 11.25, at pp. 38-39 ................... 11

Federal Judicial Center, Managing Class Action Litigation: A Pocket Guide for Judges (3d ed.
     2010) at 20 ........................................................................................................... 23

IWC Wage Order 5-2001, § 11(D) ............................................................................. 14

Manual for Complex Litigation, Fourth, § 21.632 (2004) ..................................... 2, 10

### <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.    INTRODUCTION**

Plaintiff Laura Buford submits the Joint Stipulation of Settlement and Release ("Joint Stipulation") between herself and Defendant Medical Solutions, L.L.C. to this Court for approval. In the preceding months, the Parties have expended significant time and resources in both formal and informal discovery, followed by protracted settlement discussions and private mediation in an effort to informally resolve Plaintiff's class action and PAGA representative action claims. The proposed $1,150,000 non-reversionary settlement consists of two components. The first will resolve on a class basis certain wage and hour claims of approximately 775 individuals employed by Defendant as "traveling nurses" at medical facilities in California operated by Sutter Health.[1] The second component will resolve only certain claims for civil penalties under the California Private Attorneys General Act, Cal. Labor Code sections 2698, <u>et seq.</u> ("PAGA"), related to alleged Labor Code violations involving about 1,330 individuals Defendant employed as "traveling nurses" at medical facilities in California operated by client employers <u>other than</u> Sutter Health.[2]

Approval of a class action settlement consists of two steps. First, the Court makes a preliminary evaluation of fairness of the settlement. <u>Manual for Complex Litigation, Fourth</u>, § 21.632 (2004). If the proposed settlement falls "within the range of possible approval," the Court should grant preliminary approval and authorize the parties to give notice of the proposed settlement to the class members. <u>Gautreaux v. Pierce</u>, 690 F.2d 616, 621 n.3 (7th Cir. 1982). With respect to the PAGA-only part of the settlement, while Court approval is required under Labor Code section 2699(*l*)(2), there is no specific mechanism in the PAGA statutes detailing a standard for the approval process. Accordingly, most courts apply the same standards used to evaluate a proposed class settlement. <u>Salazar v. Sysco Central</u>

---

[1] These individuals are referred to as the "Settlement Class Members," as defined in Sections II.40-41 of the Joint Stipulation.
[2] These individuals are the "Settlement Aggrieved Group" or "SAG Members," as defined in Sections II.34 and 38 of the Joint Stipulation.

California, Inc., 2017 WL 1135801, at *3-4 (E.D. Cal. 2017); Delgado v. Market Source, Inc., 2019 WL 4059850, at *3-4 (N.D. Cal. 2019).

As discussed below, in all particulars the proposed settlement falls within the "range of possible approval" and is potentially fair. Indeed, the settlement is entitled to a presumption of fairness since it was reached through arm's-length bargaining between experienced counsel, after a thorough exchange of formal and informal discovery. The negotiations were at arms-length and facilitated by an experienced and well-regarded neutral, the Hon. Jay Gandhi (Ret.), over the course of a full-day mediation session.

Accordingly, Plaintiff respectfully quests that the Court: (1) preliminarily approve the proposed settlement; (2) conditionally certify the class described in Section II.40 of the Joint Stipulation for settlement purposes only; (3) approve and authorize the mailing of the proposed notice forms to the Settlement Class Members and SAG Members; and (4) set a final approval hearing for June 9, 2020, or the Court's first available date thereafter.

## II.    STATEMENT OF FACTS

Defendant Medical Solutions, L.L.C. is an Omaha, Nebraska based company that staffs "Travel Nurses" at various health care facilities around the country.  A Travel Nurse is a licensed RN (or other skilled healthcare professional) who works short term assignments, usually around 13-16 weeks in duration, that require travel to distant locations (for example, Plaintiff was a permanent resident of Alabama but worked assignments in Northern California and elsewhere). Medical Solutions coordinates these assignments by matching the Travel Nurse with the staffing needs of various hospitals, physicians' offices, or clinics. Travel Nurses are directly employed by Medical Solutions for these short-term assignments, i.e., a Travel Nurse may work a 13 week contract, decline the next contract offered and take a month off, then work another 13 week contract in a different location, etc. [Declaration of Zachary M. Crosner ("Crosner Decl."), ¶ 2.]

Plaintiff, a Registered Nurse, worked for Medical Solutions as a Travel Nurse from around November 2014 to September 2017, including several hospital assignments in Marin and Alameda Counties. The vast majority of Plaintiff's assignments in California were at

facilities owned/operated by Sutter Health, although she also worked an assignment for Kindred Healthcare.  [Crosner Decl., ¶ 3.]

On May 10, 2018, Plaintiff filed a putative class action against Defendant in Alameda County Superior Court (Case No. RG18904415), and subsequently filed a First Amended Complaint on June 14, 2018. [Crosner Decl., ¶ 4.]  The FAC, which remains the operative pleading, alleges the following claims:

- An unpaid wage claim based on Defendant's alleged failure to pay for time associated with missed meal periods, as Plaintiff contends Defendant had an "auto-deduct" policy whereby it would automatically dock Plaintiff and others for 30-minute meal periods that were not taken;

- A meal period claim arising out of Defendant's alleged failure to maintain a compliant policy instructing and authorizing its Class Members to take all required meal breaks and corresponding failure to obtain required written waivers for second meal breaks, as well as de facto violations such as late meal breaks and meal breaks lasting less than 30 minutes.  Plaintiff also alleges Defendant failed to compensate the Class Members a one hour premium for missed, late or interrupted meal breaks;

- A rest period claim arising out of Defendant's alleged de facto failure to provide off duty rest breaks, and failing to maintain a mechanism for compensating the Class Members a one hour premium for missed, late or interrupted rest breaks;

- Derivative wage statement, waiting time, and unfair competition claims based on the foregoing alleged violations; and

- Claims under PAGA based on the violations alleged above.[3]

[FAC, at ¶¶ 45-108; Docket No. 1-1.]  Plaintiff asserted these claims on behalf of a proposed class of all non-exempt employees of Defendant who worked in California at

---

[3] Plaintiff also alleged a claim for failure to reimburse certain business expenses but ultimately did not uncover any facts supporting that claim, and further Defendant deemed all travel, housing and meal/living expenses part of the Travel Nurses overall compensation (*e.g.,* <u>Clark v. AMN Services, Inc.</u>, 2018 WL 3357467 (C.D. Cal. June 26, 2018), not expenses. [Crosner Decl., ¶ 29.]

1  any time since May 10, 2014.  [Id. at ¶ 34.]

2      Defendant then removed the case to this Court under the Class Action Fairness

3  Act, 28 U.S.C. § 1332(d). [Docket No. 1.]  The Parties subsequently exchanged initial

4  disclosures, participated in a Rule 16 conference with the Court, and propounded and

5  responded to extensive written discovery followed by lengthy meet and confer

6  discussions regarding same.  Ultimately, the Parties agreed to mediate and also agreed on

7  a protocol for exchanging additional documents and information beforehand.

8  Accordingly, both formally and informally, Defendant produced time and pay records for

9  a subset of the class members/aggrieved employees, and produced various documents

10  reflecting its wage and hour policies and practices during the class period, exemplars of

11  applicable wage statements, employee handbooks, sample meal period waiver

12  agreements, sample arbitration agreements, etc., as well as extensive information on the

13  number of putative class members and potentially aggrieved employees, the number of

14  work weeks and pay periods, average hourly rates of pay, etc. [Crosner Decl., ¶ 5.]

15      Before the mediation, Plaintiff's counsel also retained Berger Consulting Group to

16  analyze the payroll data informally produced by Defendant in preparation for the

17  mediation.  After reviewing Defendant's wage and hour policies and practices, and

18  analyzing Defendant's time and pay records with the consulting expert's asssistance,

19  Plaintif's counsel was able to evaluate the probability of class certification, success on

20  the merits, and Defendant's maximum monetary exposure for all claims, and prepare a

21  damages analysis prior to mediation. Plaintiff's counsel also investigated the applicable

22  law regarding the claims and defenses asserted in the litigation. Thus, Plaintiff and her

23  counsel are familiar with the facts and the legal issues raised by the pleadings and were

24  able to act intelligently in negotiating the settlement. [Crosner Decl., ¶ 6; Exh. B.]

25      On August 28, 2019, the Parties participated in a private mediation with a highly-

26  regarded professional neutral the Hon. Jay Gandhi (Ret.), a former federal Magistrate

27  Judge.  The settlement negotiations were at arm's length and, although conducted in a

28  professional manner, were adversarial.  The parties went into mediation willing to

- 4 -

explore the potential for a settlement of the dispute, but each side was also prepared to litigate their position through trial and appeal if a settlement had not been reached. After extensive negotiations and discussions regarding the claims and defenses in this action, as well as the risks involved in further litigation, the Parties reached a tentative agreement, the material terms of which are encompassed within the Joint Stipulation. [Crosner Decl., ¶ 7.]  A true and correct copy of the Joint Stipulation is attached to the Crosner Declaration as Exhibit A.

Plaintiff's counsel has conducted a thorough investigation into the facts of this case and, based on the foregoing discovery and their own independent investigation and evaluation, is of the opinion that the Settlement is fair, reasonable, and adequate and is in the best interests of the Settlement Class Members in light of all known facts and circumstances, including but not limited to the risk of significant delay and the defenses that could be asserted by Defendant both to certification and on the merits, trial risk, and appellate risk.  Plaintiff's counsel is further of the opinion that the PAGA-only component of the proposed settlement is likewise fair, reasonable and adequate, and advances the purposes underlying the PAGA statutes. [Crosner Decl., ¶ 8.]

## III.   THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT

### A.   Proposed Settlement Terms.

In total, Defendant will fund a settlement in the amount of $1,150,000 (the "Gross Settlement Amount"). The Gross Settlement Amount is inclusive of all payments contemplated under the Settlement and accounts for: (1) all Settlement Awards to both the Settlement Class Members and SAG Members; (2) the Plaintiff's Incentive Award not to exceed $7,500; (3) civil penalties to the California Labor Workforce and Development Agency of $157,500 in satisfaction of PAGA; (4) settlement administration costs not to exceed $25,000, but which are estimated to be no more than $19,500; (5) reimbursement of litigation costs not to exceed $15,000; and (6) attorneys' fees not to exceed $287,500 (25% of the Gross Settlement Amount). No money will revert to Defendant.

/////

1      **1.    Calculation of Settlement Awards**

2          As to the Class component of the Settlement, each Settlement Class Member who

3  does not opt-out will be entitled to a pro rata share of the Net Settlement Amount based upon

4  his or her total weeks worked in California during the Class Period.  Plaintiff estimates that,

5  after taking out all deductions described above, the Settlement Awards to the Settlement

6  Class Members will average about $795. [Crosner Decl., ¶ 9].

7          As to the PAGA-only component of the Settlement, the SAG Members each will be

8  entitled to a pro rata share of the PAGA civil penalties allocated to the SAG claims based

9  on the number of weeks worked in California during the SAG Period.[4]  The estimated net

10  recovery for the SAG Members will average about $38. [Id.]

11          As addressed below, the Parties believe a pro rata distribution based on the number

12  of weeks worked by each Authorized Claimant during the Class Period/SAG Period will

13  fairly allocate the settlement proceeds in light of the legal theories asserted and the evidence

14  adduced prior to mediation.  A pro rata distribution formula based on work weeks offers a

15  reasonable approximation of potential damages as each Authorized Claimain was subject to

16  the alleged failure to pay wages due to an auto-deduct policy, the alleged improper meal

17  break policies, and the alleged de facto meal and rest break violations.  Since Settlement

18  Class and SAG Members who worked more assignments in California presumably suffered

19  from more alleged violations over time, this formula likewise accounts for such individuals

20  likely having more potential damages.  [Crosner Decl., ¶ 10.]

21      **2.    Nature And Method Of Notice**

22          Notice packages will be mailed by the Claims Administrator to the last-known home

23  address of all Settlement Class and SAG Members by first-class US mail within thirty

24  business days of entry of the Court's Order of Preliminary Approval. Subject to the Court's

25  approval, there are separate Notice forms for the Settlement Class and SAG, with a third

26  Notice form for those individuals who are part of both the Settlement Class and SAG.  Notice

27  packages will be mailed to each individual's last known address from Defendant's records,

28
───────────────
[4] Medical Solutions paid weekly so the work weeks and pay periods are the same.

and the Claims Administrator will check all addresses against the National Change of Address database prior to mailing.  The Claims Administrator will resend notice packages returned with a forwarding address, and will conduct a skiptrace or similar search for a better address if no forwarding address is provided.  [Crosner Decl., ¶ 11.]

### 3.    Objection & Opt-Out Procedures

The notice packages for all Settlement Class Members will notify them of their right to opt-out of the proposed class portion of the settlement by submitting a signed exclusion form within forty-five days after the Claims Administrator initially mails (or re-mails) their notice package. Those who opt-out will be excluded from the class only and will not be bound by Class Release contained in the Joint Stipulation.  Additionally, the notice will inform class members of their right to object to the class component of the settlement, and detail the procedure and deadline for doing so.  [Crosner Decl., ¶ 12.]

SAG Members will not be afforded a right to opt out or object to the PAGA-only component of the settlement, and likewise the Class-SAG Members will only be permitted to opt out of or object to the class portion of the settlement. [Id.]

### 4.    The Claims Administrator

Subject to the Court's approval, the Parties propose that CPT Group, Inc. ("CPT") serve as the Claims Administrator.  Before agreeing on CPT, the Parties solicited bids from two other administration firms, and ultimately selected CPT based on a combination of cost and past experience.[5] Claims administration duties will include preparing, issuing, and mailing any and all notices; receiving and evaluating any disputes regarding work week information and estimated settlement awards; computing, processing, reviewing, and mailing individual settlement payments; generating settlement payment checks and related tax reporting forms; preparing tax returns and other required filings; preparing and submitting a claims administration declaration to the Court on final approval; administering the process regarding unclaimed checks; administering disbursements from the Net

---

[5] Plaintiff's counsel has worked with CPT on approximately four other class and PAGA settlements in the past two years. [Crosner Decl., ¶ 13.]

Settlement Amount; generating checks to class counsel for attorney's fees and costs, to Plaintiff for her incentive award, and to the LWDA for the State's share of PAGA civil penalties. CPT's estimated costs at this time are $19,500.00.  [Crosner Decl., ¶ 13; Exh. C.]

### 5.    Attorneys' Fees And Litigation Expenses

Per the Joint Stipulation, Plaintiff's counsel may request attorneys' fees on a common fund basis not to exceed 25% of the Gross Settlement Amount ($287,500), consistent with the Ninth Circuit "benchmark" fee in common fund cases. Plaintiff's counsel may also request reimbursement of actual costs not to exceed $15,000. Any portion of the attorney's fees or costs not awarded by the Court shall revert to the Net Settlement Amount for distribution to the Settlement Class Members. Plaintiff's counsel's estimated lodestar (through the filing of this motion) and costs incurred are summarized in the Crosner Declaration, filed herewith.  Counsel will provide the Court with a final lodestar calculation and final tabulation of costs in the motion for attorney's fees. [Crosner Decl., ¶ 14; Exh. D.]

### 6.    Incentive Award For Class Representatives

Subject to this Court's approval, Plaintiff will seek an incentive award of $7,500, intended to compensate her for personally undertaking the obligations and risks associated with prosecuting the action. Plaintiff also executed a broader general release of any remaining individual claims she may personally have against Defendant. Any portion of the Incentive Award not approved by the Court shall revert to the Net Settlement Amount for distribution to the Settlement Class Members and shall not revert to the Defendant. [Crosner Decl., ¶ 15; Declaration of Laura Buford, ¶¶ 2-9.]

### 7.    Releases

The proposed Releases contained in the Joint Stipulation are appropriately narrow in scope and only release claims associated with the specific factual allegations made in Plaintiff's First Amended Complaint, or claims that could have been asserted based on those allegations.

Settlement Class Members will release only the causes of actions and/or claims asserted in the First Amended Complaint and that could have been asserted based on the

facts and circumstances alleged therein.  The SAG Memberss will release only claims for violation of PAGA that were or could have been alleged based on the facts alleged in the FAC, consistent with <u>Arias v. Superior Court</u>, 46 Cal.4th 969, 985-86 (2009) (judgment in a PAGA case is "binding not only on the named employee plaintiff but also on government agencies and any aggrieved employee not a party to the proceeding").  [Crosner Decl., ¶ 16.]

Lastly, certain claims are expressly excluded from both the Class Release and the SAG Release.  These claims (the "Dittman Reserved Claims") relate to a certified class action pending against Defendant styled <u>Dittman v. Medical Solutions, L.L.C., et al.</u>, Eastern District of California Case No. 2:17-cv-01851-MCE-CKD ("<u>Dittman</u>").  The <u>Dittman</u> matter alleges claims for (1) for unpaid overtime wages; and (2) derivative claims under PAGA, Business & Professions Code §§ 17200, <u>*et seq.*</u>, and Labor Code § 203, all based on Defendant's alleged failure to properly calculate the class members' regular rate of pay for purposes of determining the proper overtime rate. [<u>Id.</u>]

**B.    The Settlement Meets the Requirements for Preliminary Approval as to the Class Claims, and the Requirements for Approval as to the SAG Claims**

The policy of the federal courts is to encourage settlement before trial.  <u>Franklin v. Kaypro Corp.</u>, 884 F.2d 1222, 1225 (9th Cir. 1989).  "Litigation settlements offer parties and their counsel relief from the burdens and uncertainties inherent in trial. . . . The economics of litigation are such that pretrial settlement may be more advantageous for both sides than expending the time and resources inevitably consumed in the trial process."  <u>Id.</u>

In class action cases, the district court must approve any settlement.  Fed.R.Civ.P. 23(e).  As explained in the <u>Manual for Complex Litigation, Fourth</u>, court approval of a class action settlement is a two-step process.  First, counsel submit the proposed terms of the settlement to the Court, and the Court makes a preliminary fairness evaluation.  If the preliminary evaluation of the settlement does not disclose a basis to doubt its fairness or other obvious deficiencies, the Court directs that notice be given to the class and sets a final fairness hearing.  <u>Manual for Complex Litigation, Fourth</u>, § 21.632 (2004).

As to the PAGA-only portion of the proposed settlement, the statute requires the Court to "review and approve any settlement of any civil action filed pursuant to this part." Labor Code § 2699(*l*)(2). Since there is no statutory authority setting forth a specific standard for reviewing a PAGA settlement, most courts apply the standards applicable to review and approval of a class action settlement and look to whether, under all the circumstances, the settlement is fair, reasonable and adequate.  A court may also examine whether the proposed PAGA relief is genuine and "meaningful" and furthers the purposes of the statute. Salazar, 2017 WL 1135801, at *3-4; Delgado, 2019 WL 4059850, at *3-4.

The "universal standard" in evaluating the fairness of a settlement under Fed.R.Civ.P. 23(e) is whether the settlement is "fundamentally fair, adequate and reasonable." Fed.R.Civ.P. 23(e)(2); Officers for Justice v. Civil Service Comm'n, 688 F.2d 615, 625 (9th Cir. 1982). "[T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." Id.  As the Ninth Circuit recognizes, "the very essence of a settlement is compromise." Id. at 624.  "[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998) citing Officers for Justice, 688 F. 2d at 625.  Even if a proposed settlement amounts to a fraction of the potential recovery, this does not mean the settlement is necessarily inadequate.  Linney, 151 F.3d at 1242.

Preliminary approval should be granted if the proposed settlement falls "within the range of possible final approval." Gautreaux, 690 F.2d at 621 n.3; Conte & Newberg, Newberg on Class Actions (4th ed. 2002), § 11.25, at pp. 38-39. Stated another way, preliminary approval is "a determination that there is what might be termed 'probable cause'

1  to submit the proposal to class members and hold a full-scale hearing as to its fairness." In

2  re: Traffic Executive Ass'n-Eastern Railroads, 627 F.2d 631, 634 (2d Cir. 1980).

3      A proposed settlement is presumed to be fair when (1) it is reached through arm's-

4  length negotiations, (2) the putative class is represented by experienced counsel, and (3) the

5  parties have conducted sufficient discovery. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396

6  F.3d 96, 116 (2d Cir. 2005).  Here, all of the factors giving rise to a presumption of fairness

7  exist.  First, the proposed settlement was the product of arm's-length, non-collusive

8  negotiations overseen by a well-respected, independent mediator. [Crosner Decl., ¶ 7.]

9  Second, the class is represented by experienced counsel. [Crosner Decl., ¶¶ 37-43.] Third,

10 the parties exchanged a significant amount of information, both formally and informally,

11 such that plaintiff and her counsel are able to make an informed recommendation about the

12 settlement. [Crosner Decl., ¶¶ 5-6.]  Thus, the settlement is presumed to be fair.

13     In evaluating a class settlement, the district court should also weigh the following

14 factors: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely

15 duration of further litigation; the risk of maintaining class action status throughout the trial;

16 the amount offered in settlement;  the extent of discovery completed and the stage of the

17 proceedings; the experience and views of counsel; the presence of a governmental

18 participant; and the reaction of the class members to the proposed settlement." Hanlon v.

19 Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).  The district court should satisfy itself

20 that the settlement is not the product of collusion between the plaintiff and the defendant.

21 Class Plaintiffs v. Seattle, 955 F.2d. 1268, 1290 (9th Cir. 1992). However, "[a]t the

22 preliminary approval stage, some of the factors cannot be fully assessed. Accordingly, a full

23 fairness analysis is unnecessary." Litty v. Merrill Lynch & Co., 2015 WL 4698475, *8 (C.D.

24 Cal. Apr. 27, 2015). Rather, the court need only decide whether the settlement is potentially

25 fair, Acosta v. Trans Union, LLC, 243 F.R.D. 377, 386 (C.D. Cal. 2007), in light of the

26 strong judicial policy in favor of settlement of class actions. Class Plaintiffs, 955 F.2d at

27 1276.

28

Here, except for the absence of a governmental participant, each factor weighs in favor of approving both the class and PAGA-only portions of the settlement.

### 1.    The Strength of Plaintiff's Case

Prior to reaching this settlement, Plaintiff's counsel conducted both formal and informal discovery and investigation into the claims alleged by Plaintiff, including, among other things, reviewing and analyzing handbooks and other policy documents, reviewing and analyzing time and payroll data produced by Defendant, and preparing a damages analysis with the assistance of a retained expert. Plaintiff's counsel's calculations are based on data from Defendant including class size and number of PAGA aggrieved employees (total current and former employees), pay period data, average hourly rate of pay, time records, pay records, and policy documents. In addition, Plaintiff's counsel has investigated the applicable law regarding the claims and defenses to the claims asserted in the litigation. Thus, Plaintiff and her counsel were able to act intelligently and effectively in negotiating the proposed Settlement. [Crosner Decl., ¶¶ 5-6.]  Based on this investigation, discovery and analysis, Plaintiff and her counsel evaluated the strengths and weaknesses of her claims as follows.

On the "auto-deduct" issue, Plaintiff contends there are numerous instances in class member time sheets where there is no record of a meal period, yet the time and payroll records reflect a 30-minute deduction for a meal period not taken. To Plaintiff, this strongly suggests Defendant was automatically deducting for a 30 minute meal period regardless of whether the time records confirmed the break was actually taken, which potentially results in employees not being paid for 30 minutes of work time.  Under California law, an unlawful failure to pay wages in violation of the Wage Orders and Labor Code requires that: (1) Plaintiff performed work for the employer; (2) Plaintiff worked hours for which he or she was not paid (or was paid less than minimum wages); and (3) the amount of wages owed. Additionally, the employer must have actual or constructive knowledge of the off the clock work. White v. Starbucks Corp., 497 F.Supp.2d 1080, 1083 (N.D. Cal. 2007).  Plaintiff's

1   experts estimated a potential violation rate around 25% on this issue, and loss of pay for

2   around potential 8,550 hours across the class. [Crosner Decl., ¶ 19.]

3        Defendant countered that in many instances actually took their meal break even if not

4   reflected on the time sheets and, accordingly, class certification is not appropriate because

5   individual inquiries would be necessary to determine this question.  For the same reasons,

6   Defendant contended the claim would fail on the merits because it would be difficult for

7   Plaintiff to show Defendant's actual or constructive knowledge that a particular class

8   member worked through a specific lunch period.  On balance, while Plaintiff believes this

9   is one of her stronger claims since the burden of proof would shift to Defendant to show

10  unrecorded meal breaks were actually received,[6] it is one of Plaintiff's smallest claims and

11  represents only a modest part of the potential damages and penalties. [Crosner Decl., ¶ 20.]

12       On the meal break claims, Plaintiff focused primarily on Defendant's failure to ensure

13  Plaintiff and the Settlement Class and SAG Members received a second meal period on shifts

14  lasting longer than 10 hours. Review of the records provided by Defendant showed about

15  80% of the shifts worked by the Settlement Class and SAG Members were longer than 10

16  hours, which is consistent with Defendant's internal policy providing the "standard"

17  schedule for Travel Nurses is three 12 hour shifts per week. [Crosner Decl., ¶ 21.] Under

18  California law, Defendant then was required to provide the Travel Nurses with a second

19  meal period during these long shifts.  IWC Wage Order 5-2001, § 11(A); Lab. Code § 512.

20  Workers in the healthcare industry, however, "who work shifts in excess of eight (8) total

21  hours in a workday may voluntarily waive their right to one of their two meal periods," via

22  a written waiver signed by the employee.  IWC Wage Order 5-2001, § 11(D).

23       Plaintiff and the substantial majority of her co-workers did not enter into the

24  mandatory written waiver of a second meal break, and information from Defendant

25  suggested only about 15% of the affected Travel Nurses executed the mandatory written

26  waiver.  Thus, for the bulk of these individuals, Plaintiff contends she will merely need to

27

28  [6] Defendant's failure to maintain accurate records gives rise the rebuttable presumption articulated by the California Supreme Court that "no meal period was provided." Brinker Restaurant Corp. v. Superior Court, 53 Cal.4th 1004, 1053 (2012).

look to the written time sheets to see if Settlement Class and SAG Members took their second meal periods on these longer shifts, and then look to the payroll records to see if Medical Solutions paid the premium wage in lieu of the missed meal.  Next, review of the time records produced showed additional potential de facto meal period violations for meals provided late in the class member/aggrieved employee's shifts, or that lasted less than 30 minutes, in violation of the Labor Code and Wage Orders.  These de facto violations, however, did not significantly add to the potential damages since an employee is entitled to only one premium payment per shift regardless of how many violations occur.  [Crosner Decl., ¶ 22]

Here, Defendant again argued that in many instances the class members took a second meal break even if not reflected on the time sheets and Plaintiff would not be able to certify this issue because individual inquiries would predominate in resolving that question. Defendant also contended it maintained a fully-compliant meal break policy at all times, and it always provided the Settlement Class and SAG Members with the opportunity to take a second meal break and thus met the requirements imposed by California law.  Per Defendant, if individuals did not take a second meal period, it was in violation of company policy and, once again, a multitude of individual inquiries would be necessary to determine if an individual may have missed a meal break by personal choice or for some other reason. Lastly, Defendant noted it did pay the mandated premium wage for missed meal periods at least some of the time, which Plaintiff confirmed in her review of the payroll and time records produced.  While Plaintiff believes Defendant's records and her testimony and that of her co-workers will support this claim, she nevertheless must acknowledge Defendant has a viable and multi-layered defense.  [Crosner Decl., ¶ 23.]

On the rest break claim, Plaintiff's claim focused exclusively on de facto violations for missed rest breaks, and pointed to employee time records that specifically noted a missed rest break.  Plaintiff's expert's review of the time records provided revealed a violation rate of around 6% where the time sheets had a handwritten notation of "missed break" or similar language.   [Crosner Decl., ¶ 24.]

1    Defendant advanced several defenses to this claim. First, Defendant argued its

2  written rest period policy is fully compliant and expressly authorized all rest periods

3  required under California law.  Defendant further argued that, since it is not required to

4  record rest periods, any evidence of a failure to authorize rest periods and/or

5  discouragement from taking rest periods would be purely anecdotal and may not result in

6  certification of Plaintiff's rest period claims. Defendant also contended it is only liable if

7  Plaintiff can prove, on a shift-by-shift basis, that Class Members actually did not take a

8  rest break. This arguably would have made class certification more difficult and/or

9  rendered trial of the PAGA claims unmanageable. Therefore, a sharp compromise of this

10  theory of rest period liability was in order and, as noted, the provable violation rate was

11  nominal in any event. [Crosner Decl., ¶ 25.]

12    Plaintiff's claims for penalties under Labor Code §§ 203 and 226 are derivative of

13  the underlying unpaid wage and meal/rest break claims and, accordingly, they would

14  essentially rise or fall with Plaintiff's success or failure on her primary claims.  Further,

15  Plaintiff had to account for the discretionary nature of such awards and the "good faith" and

16  other defenses available to Defendant. On the Section 226 wage statement claims, Defendant

17  looked to Maldonado v. Epsilon Plastics, Inc., 22 Cal.App.5th 1308 (2018), where the Court

18  held a wage statement claim fails as a matter of law when it is based on the alleged failure

19  to show all wages purportedly "earned" but the wage statements accurately reflected the

20  wages paid to the employee. [Crosner Decl., ¶ 26.] The Maldonado court agreed with the

21  employer's "commonsense position that the pay stubs were accurate in that they correctly

22  reflected . . . the pay received" and held that a later adjudicated failure to pay wages "does

23  not mandate that [employees] also receive penalties for the wage statements which

24  accurately reflected the compensation" they were paid at the time. Id.

25    As to Section 203 waiting time penalties, Defendant argued Plaintiff and the Class

26  Members may not obtain waiting time penalties as a result of the alleged meal and rest

27  periods claims, but only the unpaid wage cause of action, because meal and rest premiums

28  are not considered "wages." In Murphy v. Kenneth Cole Productions, Inc., 40 Cal.4th 1094

(2007), the California Supreme Court characterized the extra hour paid for meal period violations as a 'premium wage' rather than a penalty but, in <u>Kirby v. Immoos Fire Protection, Inc.,</u> 54 Cal.4th 1244 (2012), the same Court held a meal period violation is not tied to the nonpayment of wages, rendering the issue uncertain. Defendant also raised a good faith defense to the waiting time penalties as it applies to both meal/rest periods and underpaid overtime premiums. <u>Amaral v. Cintas Corp. No. 2,</u>163 Cal.App.4th 1157, 1203-4 (2008) (employer did not willfully fail to pay wages under Labor Code § 203 even though the class prevailed on the merits on the underlying claim for failing to pay living wages).  [Crosner Decl., ¶ 27.]

Finally, on the PAGA claims of both the Settlement Class Members and SAG Members, in addition to the merits defenses addressed above, Plaintiff recognizes that, because the issues here are fairly contested, there is a real possibility the Court might decline to award PAGA penalties even if she prevailed on the merits. [Crosner Decl., ¶ 28.]  In this regard, several recent cases have resulted in no award of PAGA civil penalties. <u>E.g.</u>, <u>In re: Taco Bell Wage and Hour Actions</u>, 2016 U.S. Dist. LEXIS 48557 (E.D. Cal. Apr. 8, 2016) (PAGA penalties denied after trial); <u>Makabi v Gedalia</u>, 2016 Cal.App. Unpub. LEXIS 1489 (Mar. 2, 2016) (court found in favor of plaintiffs on Labor Code claims but declined to award penalties).

Alternatively, the Court has broad discretion to reduce the amount of PAGA civil penalties awarded "based on the facts and circumstances of a particular case" if "to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Labor Code § 2699(h). Plaintiff is acutely aware of a number of recent PAGA cases resulting in nominal penalty awards via settlement or even after the plaintiff prevailed on the merits at trial. <u>E.g.</u>, <u>Cotter v. Lyft, Inc.</u>, 193 F.Supp.3d 1030 (N.D. Cal. 2016) (PAGA settlement was fair and reasonable even though it resulted in a 97.5% reduction from the maximum penalty); <u>Carrington v. Starbucks Corp.</u>, 30 Cal.App.5th 504 (2018) (trial court awarded penalties of $5 per pay period after a bench trial, which decision was upheld on appeal); <u>Fleming v. Covidien</u>, 2011 U.S. Dist. LEXlS 154590, *8-9 (C.D. Cal. 2011) (court reduced

potential PAGA penalties by over 82% after a bench trial). Accordingly, Plaintiff applied a significant discount to the value of the PAGA claims. [Crosner Decl., ¶ 28.]

The settlement obviates the significant risk that this Court may deny certification of all or some of Plaintiff's claims. Furthermore, even if Plaintiff obtained certification of all or some of the claims, continued litigation would be expensive, involving a trial and possible appeals, and would substantially delay and reduce any recovery by the Settlement Class Members. Similarly, as to the SAG Members' PAGA claims, the Court could easily rule such claims are unmanageable for the reasons discussed above, or ultimately execercise its discretion to reduce any award of civil penalties significantly. While Plaintiff is confident in the merits of her claims, legitimate controversies exist as to each cause of action and Defendant has multiple potential defenses to both class certification and on the merits. Plaintiff also recognizes that proving the amount of wages and penalties due to each individual would be a lengthy, expensive, and uncertain task.

Although Plaintiff believes she could have prevailed, there were no guarantees. When the risks of prevailing at both certification and trial are factored into the equation, as to both the class and PAGA-only claims, the settlement value is reasonable and supported. The $1,150,000 settlement amount represents a significant percentage of Defendant's overall potential exposure. [Crosner Decl., ¶¶ 17-18.] Also, the assigned certification probabilities far exceed the rate of certification in contested motions in California over the past 5 years, based upon data available through the California Courts website. See Findings of the Study of California Class Action Litigation, 2000-2006, available at http://www.courts.ca.gov/documents/class-action-lit-study.pdf (finding that only 21.4% of all class actions were certified either as part of a settlement or as part of a contested certification motion). In other words, well under 20% of all class actions are certified by way of contested motion. The probabilities are also in line with reductions of civil penalties awarded in PAGA cases, including many that have gone to trial. More significantly, each Settlement Class Member is eligible to receive an average net benefit of approximately $795,

while each SAG Member will receive approximately $38 as their share of the civil penalties. [Crosner Decl., ¶ 9.]

In sum, when the risks of litigation, the uncertainties involved in achieving class certification, the potential applicability of hundreds of arbitration agreements, the burdens of proof necessary to establish liability, the probability of appeal of a favorable judgment, etc., all are accounted for, the total settlement amount of $1,150,000 is within the "ballpark" of reasonableness both overall and as to both component parts, and approval of the settlement is appropriate.

**2.     The Risk, Expense, Complexity and Likely Duration of Further Litigation**

Absent settlement, litigation of this matter will remain highly contentious leading up to class certification and potentially beyond.  Without the proposed settlement, the parties would be required to litigate class certification, as well as the ultimate merits of the case - a process that is long, complex, and expensive. If the settlement is not approved, Defendant will oppose class certification and conduct further dispositive motion practice to defend against Plaintiff's claims. Furthermore, even if Plaintiff secured and maintained class certification and prevailed on the merits, she almost certainly would face a protracted appellate process. Settlement of this matter will conserve the resources of both the Court and the parties, and as a result Plaintiff submits this factor weighs heavily in favor of preliminary approval. [Crosner Decl., ¶ 31.]

**3.     The Risk of Maintaining Class Action Status Throughout the Trial**

Plaintiff and her counsel strongly believe their lawsuit is maintainable as a class action.  However, there are risks associated with certifying a class in the first instance, and as with any certified class action there is always the potential for future decertification following merits discovery.

This is particularly true in this matter given the nature of Defendant's business and the fact that, as a staffing company, its employees worked for a number of different clients and at some 250 medical facilities throughout California.  While Plaintiff contends there are

common themes applicable to all Class Members based on Defendant's own policies, she also recognizes the very real possibility that the Court might agree with Defendant and find insurmountable individual issues are present given the sheer number of clients and dozens of locations across California where Medical Solutions staffed the Settlement Class and SAG Members.  [Crosner Decl., ¶ 31.]

In fact, it is this issue that ultimately resulted in the class-wide portion of the proposed settlement being limited only to individuals who worked assignments for Sutter Health rather than the broader class definition alleged in the FAC.  Defendant argued forcefully it would not consider settling the potential claims of individuals who worked at non-Sutter Health facilities on a class basis because Plaintiff could not adequately represent those individuals since she worked almost exclusively at Sutter Health facilities,[7] and the impact of the various wage and hour policies and procedures of other client employers on Plaintiff's claims would both create myriad individual issues and render merits litigation and trial unmanageable.  While Plaintiff contended procedural mechanisms such as subclassing or sampling and statistical analysis could overcome these arguments, as a compromise the Parties ultimately agreed to limit the settlement class as defined in the Joint Stipulation. [Crosner Decl., ¶ 32.]

Next, Defendant provided information establishing hundreds of Settlement Class Members signed arbitration agreements and, accordingly, could be required to arbitrate their claims individually rather than participate in a class action.  This development further complicated an already difficult path to class certification, and significantly influenced Plaintiff's evaluation of the case. [Crosner Decl., ¶ 33.]

At bottom, Plaintiff acknowledges Medical Solutions' arguments against class certification present considerable risk, and consequently this factor suggests settlement is preferable to continued litigation.

/////

---

[7] As noted, Plaintiff did work one assignment for Kindred Healthcare.  Defendant, however, provided information showing that only 2 other individuals were staffed with that client in California during the Class Period.

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL**          **CASE NO. 4:18-CV-04864-YGR**

### 4.      The Amount Offered in Settlement

Defendant has agreed to settle the action for a Gross Settlement Amount of $1,150,000, which amount is eminently reasonable in light of Defendant's significant defenses to certification of the alleged claims, the potentially applicable arbitration agreements, and additional defenses on the merits. Through the extensive amount of information exchanged by the parties, Plaintiff weighed the risks of continued litigation against the benefits of the proposed settlement and determined it to be more than reasonable.

A settlement is not judged against what plaintiff might recover had she prevailed at trial, nor does the settlement have to provide 100% of the damages sought to be fair and reasonable. Linney, 151 F.3d at 1242; White v. Experian Information Solutions, Inc., 803 F.Supp.2d 1086, 1098 (C.D. Cal. 2011) (rejecting contention settlement was not fair and reasonable even though it represented 99% discount off the maximum value of the claims); see also Wershba v. Apple Computers, Inc. 91 Cal.App.4th 224, 246, 250 (2001) ("Compromise is inherent and necessary in the settlement process…even if the relief afforded by the proposed settlement is substantially narrower than it would be if the suits were to be successfully litigated, this is no bar to a class settlement because the public interest may indeed be served by a voluntary settlement in which each side gives ground in the interest of avoiding litigation.").

In determining whether the amount offered in settlement is fair, a court should compare the settlement amount to the parties' estimates of the maximum amount of damages recoverable in a successful litigation. In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000). Using the pre-mediation formal and informal production of payroll data, time data, and various documents evidencing Defendant's wage and hour policies and procedures, Plaintiff's counsel estimated possible damages based on various theories of liability. Using that data, Plaintiff ran various calculations under different theories of liability and estimated Medical Solutions' likely exposure at approximately $3,531,650 on the Class Members' claims, and about $4,441,000 in potential civil penalties for the PAGA-only claims of the SAG Members. [Crosner Decl., ¶¶ 17-18.]

Thus, Plaintiff estimated the maximum potential recovery at about $7,975,000 and the $1,150,000 settlement amount is approximately 15% of the theoretical maximum possible recovery.  On a net basis, the amount that will be available for distribution to the Settlement Class Members represents about 17% of the class maximum recovery, and the amount allocated to civil penalties on the SAG Members' claims is about 4.5% of the maximum recovery. [Crosner Decl., ¶¶ 17-18, 34.]  These calculations, however, do not apply any risk adjustment to Plaintiff's claims to account for Defendant's multiple factual and legal defenses - of which there are many.

As addressed above, on the class claims, Plaintiff faced the risk that some or all of the claims would not be certified for class treatment, that a certified class could be decertified, or that a jury would decide some or all of the claims lacked merit. Additionally, as Plaintiff subsequently learned, a majority of class members entered into arbitration agreements with Defendant and consequently the class size potentially could be cut by some two-thirds.  Similarly, Plaintiff discounted the potential PAGA penalties for several reasons -- as discussed above, the Court possesses wide discretion to reduce such penalties, and many recent PAGA cases have resulted in nominal penalty awards even after plaintiff prevailed on the merits.  Further, Defendant had strong arguments that trial of the PAGA claims would have been unmanageable in light of the overall number of client employers and locations where the SAG Members were staffed.

And, as with any case, a settlement discount was warranted to account for the fact that continued litigation would have resulted in increased costs and attorney's fees, and would have resulted in significant delay while the parties fought over class certification, merits discovery and trial (assuming certification), and potential appeals, all of which would not necessarily result in conferring significant additional benefit to the class.

Plaintiff's counsel discounted the value of the class claims consistent with these risks and carefully weighed the likelihood of the class receiving substantially greater benefit if the litigation continued. Plaintiff's counsel concluded – in light of the very real risks discussed above – settlement on the proposed terms, without further prolonged and costly

1   litigation, was in the best interests of the class and also that the settlement of the PAGA

2   claims is meaningful and further the purposes underlying the PAGA statutuory scheme.

3   [Crosner Decl., ¶ 35.]

4         Even on a risk discounted basis, the settlement will provide significant monetary

5   compensation to the Class Members for their unpaid wages and other damages while

6   eliminating the risks of losing class certification, obtaining a lower amount at trial with

7   greater costs, or losing altogether. Following the deduction of attorney's fees and costs,

8   the enhancement payment, the PAGA penalty payment, and settlement administration costs,

9   this results in a Net Settlement Amount of approximately $607,000 for the Class Members,

10  while the SAG Members will share $50,000 in civil penalties with no impact to their

11  potential individual claims against Medical Solutions.  As noted, the settlement will result

12  in an average share of approximately $795 for the Class Members, based on approximately

13  $34 per work week (net), and about $38 in civil penalties for the SAG Members.  Further,

14  these amounts are comparable to other settlements secured by Plaintiff's counsel in matters

15  alleging similar claims.  [Crosner Decl., ¶ 36.]  Importantly as well, the proposed settlement

16  is non-reversionary and will provide immediate benefits to the Class Members without a

17  claims process.  White, 803 F.Supp.2d at 1098; c.f., Federal Judicial Center, Managing Class

18  Action Litigation: A Pocket Guide for Judges (3d ed. 2010) at 20, available at http://

19  www.fjc.gov/sites/default/files/2012/ClassGd3.pdf    (reversionary    provisions    and/or

20  cumbersome claims process may indicate lack of fairness).

21        In light of the many and significant obstacles Plaintiff faces in pursuing her claims,

22  Plaintiff submits the overall size of the recovery is fair.  Further, the significant individual

23  settlement awards and the fact that the settlement is entirely in line with other settlements

24  involving similar claims both support a finding the proposed settlement is fair, adequate,

25  and reasonable. Accordingly, this factor weighs in favor of approval as well.

26  /////

27  /////

28

1
2

### 5.    The Extent of Discovery Completed and the Stage of the Proceedings

3     Prior to reaching this settlement, Plaintiff's counsel conducted both formal and
4  informal discovery and investigation into the claims alleged, including reviewing and
5  analyzing handbooks and other policy documents, reviewing and analyzing time and payroll
6  data produced by Defendant, and preparing a damages analysis with the assistance of
7  consulting experts. [Crosner Decl., ¶¶ 5-6.] Plaintiff's counsel's calculations are based on
8  reliable data  including class size (total current and former employees) and the number of
9  aggrieved employees, work week/pay period data, average hourly rate of pay, time records,
10  payroll records, and extensive policy documents. In addition, Plaintiff's counsel has
11  investigated the applicable law regarding the claims and defenses to the claims asserted in
12  the litigation. Thus, Plaintiff and her counsel were able to act intelligently and effectively in
13  negotiating the proposed Settlement. Plaintiff's counsel has sufficient familiarity with the
14  facts of the case to make an informed decision about the fairness of the settlement.  [Crosner
15  Decl., ¶¶ 5-6, 8.]

16          ### 6.    The Experience and Views of Counsel.

17     Plaintiff's counsel has extensive experience in wage and hour class actions and are
18  well-qualified to prosecute this action. [Crosner Decl., ¶¶ 37-43.]  Based on this combined
19  experience, and after factoring in the risks articulated above, Plaintiff's counsel are confident
20  the proposed settlement accords with the prevailing sense of "fair, adequate, and reasonable"
21  in both the class action and PAGA contexts, and that the PAGA-only component of the
22  settlement furthers the purposes underlying the PAGA statutes.

23          ### 7.    The Reaction of the Class to the Settlement.

24     To date, no class member has expressed any opposition to the settlement. [Crosner
25  Decl., ¶ 44.] In any event, class members will have the opportunity to express any opposition
26  during the notice period.  Similarly, the LWDA has been provided with the Joint Stipulation,
27  this motion, and given notice of the preliminary approval hearing.  [Crosner Decl., ¶ 45;
28  Exh. E.]

### 8.    No Collusion Between the Parties or their Counsel.

As discussed above, the settlement is the product of adversarial, non-collusive, and arm's-length bargaining between experienced counsel, facilitated by a well-respected mediator.  [Crosner Decl., ¶ 7.]  The use of a mediator experienced in the settlement process tends to establish that the settlement process was not collusive.  See, e.g., Satchell v. Fed Ex. Corp., 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007).  There are no undisclosed side agreements between the parties or their counsel.  [Crosner Decl., ¶ 7.]

## IV.    THE COURT SHOULD CONDITIONALLY CERTIFY THE SETTLEMENT CLASS

Per Section IV.B. of the Joint Stipulation, the parties jointly request certification of a Fed.R.Civ.P. 23(b)(3) opt-out class for settlement purposes only, consisting of all persons employed by Defendant in California as non-exempt employees, including but not limited to traveling healthcare professionals, who worked an assignment at any facility operated by Sutter Health or a related company during the Settlement Class Period (May 10, 2014 to the date of preliminary approval). The Class meets the requirements for class certification under Fed.R.Civ.P. 23(a) and (b)(3).

First, the Class consists of at least 774 members. [Joint Stipulation, § V.A.1.a.]  In Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001), the court observed that if a class exceeds 40 members, the numerosity requirement is met. Further, the class members are ascertainable by reference to Defendant's personnel and payroll records. [Id. at § IV.E.]

Second, Plaintiff contends there are common questions of fact and law, and these predominate over individual questions. These common questions include: (1) Defendant's common policies and practices for failing to pay wages due by allegedly "auto-deducting" for missed meal periods; (2) Defendant's common policies and practices regarding meal periods, including whether whether second meal breaks were required, whether Defendant obtained required written meal period waivers, and whether Defendant paid premium wages in lieu of missed or non-compliant meal periods; (3) Defendant's common policies regarding rest periods and payment of the required premium wages in lieu of missed or non-compliant

1  rest periods; and (4) whether these alleged violations support the derivative claims for

2  improper itemized wage statements, waiting time penalties, and unfair competition. These

3  common questions predominate over such individual questions as a class member's measure

4  of damages. [Crosner Decl., ¶ 51.]

5        Third, Plaintiff's claims are typical of those of the other class members. Ms. Buford

6  is a former Medical Solutions non-exempt "Travel Nurse" who worked multiple contracts

7  in California during the relevant time period at medical facilities owned by Sutter Health,

8  and who believes she was injured by Defendant's common practices alleged above. [Crosner

9  Decl., ¶ 52; Buford Decl., ¶¶ 2-3.]

10        Fourth, Ms. Buford is an adequate class representative because she has retained

11  competent counsel and she has no interests adverse to those of the class.  [Crosner Decl., ¶¶

12  37-43.]

13        Finally, a class action is superior to other procedural mechanisms for resolving these

14  claims.  Because of the size of the class, individual joinder is impractical.  A class action

15  will permit a large number of similarly situated individuals to resolve their common claims

16  in a single forum without unnecessary expense, duplication of effort, and burden on the

17  judicial system. [Crosner Decl., ¶ 53.]

18  **V.    CAFA AND PAGA NOTICE**

19        Per Section IV.D of the Joint Stipulation, Defendant will serve all notices required

20  by 28 U.S.C. section 1715 within ten days of the filing of this motion.  Additionally, prior

21  to filing this motion, Plaintiff provided notice of the proposed settlement of the PAGA

22  claims and the approval hearing to the LWDA.  [Crosner Decl., ¶ 45; Exh. E.]

23  **VI.    CONCLUSION**

24        For the foregoing reasons, the parties jointly request that the Court preliminarily

25  approve the proposed settlement, conditionally certify the proposed Class for settlement

26  purposes only, approve the notice forms attached as Exhibits A-C to the Joint Stipulation,

27  and set a final approval hearing for June 9, 2020, or on the Court's first available date

28  thereafter.

1

2     Dated:  December 10, 2019                    **CROSNER LEGAL, P.C.**

3

4                                            By: _____

5                                                   Michael Crosner
                                                    Zach Crosner
6                                                   J. Kirk Donnelly
                                                    Attorneys for Plaintiff
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PROOF OF SERVICE**
*Buford v. Medical Solutions, L.L.C..*
*Northern District (Oakland) Case No. 4:18-cv-04864-YGR*

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 433 N. Camden Dr., Ste. 400, Beverly Hills, CA 90210.

On December 10, 2019, I served true copies of the following document(s) described as

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS AND REPRESENTATIVE ACTION SETTLEMENT**

**DECLARATION OF ZACHARY M. CROSNER IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS AND REPRESENTATIVE ACTION SETTLEMENT**

**JOINT STIPULATION OF CLASS SETTLEMENT AND RELEASE BETWEEN PLAINTIFF AND DEFENDANT**

**[PROPOSED] ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS AND REPRESENTATIVE ACTION SETTLEMENT**

on the interested parties in this action as follows:

SEE ATTACHED SERVICE LIST

☒      BY ELECTRONIC TRANSMISSION. I transmitted copies of the above-referenced document(s) on the interested parties in this action by electronic transmission. Said electronic transmission was reported as complete and without error.

☐      BY FACSIMILE TRANSMISSION. I transmitted copies of the above-referenced document(s) on the interested parties in this action by facsimile transmission from (310) 510-6429. A transmission report was properly issued by the transmitting facsimile machine and the transmission was reported as complete and without error.

☐      BY UNITED STATES POSTAL SERVICE.  I enclosed the documents in electronic pdf format and submitted them electronically into the mail provider, Letterstream, Inc.'s, online mail portal (letterstream.com) to be mailed addressed to the entities and/or persons listed in the Service List as set forth herein. I caused an envelope containing the documents to be placed for collection and mailing and to be mailed by First Class Mail, following our law firm and Letterstream, Inc.'s ordinary business practices. I am readily familiar with our business practices and the business practices of Letterstream, Inc. for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. Pursuant to that practice, the above-referenced document(s) were sealed in an envelope, with postage paid, and deposited with a a post office, mail box, sub-post office, substation, mail chute, or other facility or postal pick up/drop off regularly maintained by the United States Postal

**PROOF OF SERVICE**

1

Service or an affiliate thereof, at or near Phoenix, Arizona.

☐    BY OVERNIGHT MAIL SERVICE. I enclosed the documents in electronic pdf format and submitted them electronically into the mail provider, Letterstream, Inc.'s, online mail portal (letterstream.com) addressed to the entities and/or persons listed in the Service List as set forth herein. I caused an envelope containing the documents to be placed for collection and mailing and to be mailed by Overnight Mail via Federal Express, following our law firm and Letterstream, Inc.'s ordinary business practices. I am readily familiar with our business practices and the business practices of Letterstream, Inc. for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with Federal Express, an express carrier, in Phoenix, Arizona, or delivered with any and all delivery fees to an authorized courier or driver authorized by the express service carrier to receive documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 10, 2019, at Los Angeles, California.

Maria Monterrey

**PROOF OF SERVICE**

2

SERVICE LIST
*Buford v. Medical Solutions, L.L.C..*
*Northern District (Oakland)*
*Case No. 4:18-cv-04864-YGR*

Kenneth Dawson Sulzer                    Attorneys for Defendant:
Anthony David Sbardellati                **Medical Solutions, L.L.C.**
Matthew Scholl                           *a limited liability corporation*
Sarah Kroll-Rosenbaum
Sayaka Karitani
**Constangy, Brooks, Smith &**
**Prophete, LLP**
2029 Century Park East, Suite 1100
Los Angeles, CA 90067
(310) 909-7775
Fax: 424 276-7410

**PROOF OF SERVICE**

3